IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| PACIFICARE HEALTH SYSTEMS, INC. | ) | |
| | ) | Civil Action No. _____ |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| ABBOTT LABORATORIES, FOURNIER | ) | |
| INDUSTRIE ET SANTE, and | ) | **JURY TRIAL DEMANDED** |
| LABORATORIES FOURNIER, S.A., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## **PLAINTIFF'S ORIGINAL COMPLAINT**

1.      This litigation arises from a series of actions undertaken by Defendants Abbott Laboratories ("Abbott"), Fournier Industrie et Sante and Laboratories Fournier, S.A. (collectively, "Fournier" and collectively with Abbott, "Defendants") to monopolize sales of fenofibrate drug products in violation of the federal and state antitrust laws.

2.      Defendants market fenofibrate drug products under the brand-name TriCor® ("TriCor"). TriCor is used to reduce high levels of low-density lipoprotein cholesterol, also known as "bad cholesterol."

3.      Defendants unlawfully monopolized and/or attempted to monopolize the domestic market for fenofibrate drug products by engaging in an overall scheme to prevent generic competitors from entering the market with lower-cost generic equivalents.

1

4.    Defendants implemented this scheme by switching the formulations for their products, without changing the indications for which the products are used, and then taking affirmative steps to eliminate the demand for the old products. The components of Defendants' scheme to thwart generic entry include the following:

(a)    Defendants obtained Federal Drug Administration ("FDA") approval to market a particular formulation and dosage of TriCor.

(b)    When generic manufacturers developed and sought to sell a non-infringing lower-cost generic equivalent of the TriCor product, Defendants engaged in a range of practices that had the purpose and effect of delaying the launch of the competitive generic products until after Defendants were able to launch a new formulation of their TriCor product.

(c)    During the period when Defendants' delay tactics blocked competitive generic entry, Defendants charged supra-competitive prices for TriCor.

(d)    When market entry by a generic competitor was imminent, Defendants began selling and marketing a new formulation and dosage of TriCor. The new formulation was the same medicine, used the same active ingredient, and contained the same indication as the old formulation.

(e)    At the same time, Defendants took affirmative steps to eliminate market demand for the old formulation while Defendants still had market exclusivity for the old formulation.

(f)    As a result, by the time generic manufacturers were allowed to enter the market for the old formulation, Defendants had shifted market demand to the new formulation, over which they exercised market exclusivity.

5.    Defendants' scheme had the purpose and effect of ensuring that a generic company was effectively unable to launch a competing generic product. Just as a generic manufacturer was about to enter the market with its generic alternative, which could and would be substituted by pharmacists as a lower-cost option, Defendants used their market power to shift market demand away from dosages and formulations that the generic manufacturers were about to enter. Because

2

the generic product was approved for the old formulation, pharmacists could not legally substitute the generic product for the new TriCor product even though the products had the same indications.

6.     Defendants' conduct unreasonably restrains competition.  By implementing their unlawful scheme, Defendants have precluded generic competition and are able to do so indefinitely.

7.     As a direct and proximate result of Defendants' conduct, Plaintiff, PacifiCare Health Systems, Inc. ("PacifiCare") a third-party payer for TriCor, has been denied the benefits of free and unrestrained competition in the TriCor market.

8.     Specifically, PacifiCare paid higher prices than it would have paid if a generic version of TriCor would have been available.  The generic versions would have been priced significantly below TriCor.

## THE PARTIES

9.     Plaintiff PacifiCare is organized under the laws of Delaware.  It maintains its headquarters in Cypress, California.  PacifiCare is a third-party payer that paid and continues to pay some or all of the costs of its members' TriCor purchases.

10.     Defendant Abbott is a corporation organized under the laws of Illinois with its principal office located at 100 Abbott Park Road, Abbott Park, Illinois 60064.

11.     Defendant Fournier Industrie et Sante and Laboratoires Fournier, S.A., are French corporations having their principal place of business at 42 Rue de Longvie, 21300 Chenove, France.

## JURISDICTION AND VENUE

3

12.     This action is brought under Section 16 of the Clayton Act, 15 U.S.C. § 26, for injunctive relief and the costs of suit, including reasonable attorney's fees, for injuries to plaintiff resulting from, *inter alia*, Defendants' violations of the federal antitrust laws.

13.     The Court has jurisdiction over this action pursuant to 28 U.S.C. § § 1331, 1332 and 15 U.S.C. § 26.

14.     This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a).

15.     Venue is proper in this judicial district pursuant to 15 U.S.C. § 22 and 28 U.S.C. § 1391(b) because Defendants are found or transact business in this District, a substantial part of the affected trade or commerce has been carried out in this District, and a substantial part of Defendants' unlawful scheme took place in this District.

## INTERSTATE TRADE AND COMMERCE

16.     At all relevant times, TriCor was manufactured by Defendants and was then sold, shipped and transported across state lines to United States customers located outside the state of manufacture. In connection with the purchase and sale of TriCor, monies, contracts, bills, and other forms of business communications and transactions were transmitted in a continuous and uninterrupted flow across state lines.   Various means and devises were used to effectuate Defendants' actions, including the United States mail, interstate travel, interstate telephone commerce, and electronic commerce.  Defendants' activities were within the flow of, and have substantially affected, interstate commerce.

## RELEVANT MARKET

17.    The relevant product market is the market for fenofibrate drug products, such as TriCor, and its generic bioequivalents rated "AB" by the FDA. The relevant geographic market is the United States. Defendants' market share in the relevant market ranged from approximately 95% to 100%.

## THE REGULATORY SCHEME FOR THE PHARMACEUTICAL INDUSTRY

18.    Under the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 et seq. (the "Act"), approval by the FDA is required before a company may begin selling a new drug. To obtain approval, a manufacturer files a New Drug Application ("NDA") containing specific data concerning the drug and patient information.

19.    Generic drugs are drugs that the FDA has found to be bioequivalent to brand-name drugs, i.e., generic drugs have the same active chemical composition and provide the same therapeutic effects as the pioneer, brand-name drugs. The FDA assigns the generic drug an "AB" rating when a generic drug meets the necessary bioequivalence requirements such that the generic product is considered to be bioequivalent to the brand name or reference product.

20.    Generic drugs are invariably priced below the branded drugs to which they are bioequivalent. The first generic competitor to enter a market typically does so at a price lower than the price of the equivalent brand-name drug and takes a substantial amount of market share away from the brand-name manufacturer. As additional generic competitors come to market, the price of the generic equivalents continues to fall, and their combined market share continues to grow.

21.    When a physician writes a prescription for a brand-name drug such as TriCor, that prescription permits the patient to receive the drug named or its AB-rated generic equivalent.

5

Because generic drugs are so much cheaper than brand-name drugs, AB-rated generic drugs are substituted for the branded version of those drugs. Pursuant to State generic drug substitution laws, pharmacists are permitted or required to substitute a generic product for a brand-name product unless the doctor has indicated that the prescription for the brand-name product must be dispensed as written ("DAW"). Only drugs that carry the FDA's AB generic rating may be substituted by a pharmacist for a physician's prescription for a brand-name drug.

22.    The price competition engendered by generic drug manufacturers benefits all purchasers of the drug, who are able to buy a bioequivalent chemical substance at much lower prices.

23.    Congress enacted the Hatch-Waxman Act in 1984 to establish an abbreviated process to expedite and facilitate the development, approval and marketing of generic drugs. To effectuate its purpose, the Hatch-Waxman Act permits a generic drug manufacturer to file an "abbreviated" new drug application ("ANDA"), which incorporates by reference the safety and effectiveness data developed and previously submitted to the FDA by the company that manufactured the original, "pioneer" drug.

24.    At all times relevant to this lawsuit, the ANDA filer must make one of four certifications to the FDA:

     i.     that no patent for the pioneer drug has been filed with the FDA (a "Paragraph I Certification");

     ii.     that the patent (or patents) for the pioneer drug has (or have) expired (a "Paragraph II Certification");

     iii.     that the patent for the pioneer drug will expire on a particular date and the generic company does not seek to market its generic product before that date (a "Paragraph III Certification"); or

6

iv.    that the patent for the pioneer drug is invalid or will not be infringed upon by the proposed generic company's product (a "Paragraph IV Certification").

21 U.S.C. § 355(j)(2)(A)(vii). In the case of a patent that has not yet expired, the ANDA applicant's only certification options are Paragraph III or IV certifications. *See id.* If the generic manufacturer makes a Paragraph IV Certification, the ANDA applicant must notify the patent owner of the filing and explain why the patent is invalid or will not be infringed.

25.    The patent owner, upon receiving a Paragraph IV Certification from an ANDA applicant, has a 45-day statutory period in which to initiate a patent infringement suit against the applicant. *See* 21 U.S.C. § 355(j)(5)(B)(iii). If no action is initiated within 45 days, FDA approval of the generic product is not delayed by patent issues. However, if a patent infringement suit is brought within the 45-day window, FDA approval of the ANDA is automatically postponed until the earliest of (a) the expiration of the patents; (b) the expiration of 30 months from the day the patent holder received notice of the paragraph IV certification; or (c) a final judicial determination of non-infringement.

26.    As a result, at all times relevant to this lawsuit, brand-name drug manufacturers could file a patent infringement lawsuit, regardless of the lawsuit's merits, and automatically block a generic from entering the market for up to 30 months.

## TRICOR AND ITS GENERIC EQUIVALENTS

27.    Fenofibrate, the active pharmaceutical ingredient in TriCor, is a chemical used to treat adults with high cholesterol. Fenofibrate reduces high levels of low-density lipoprotein cholesterol ("LDL-C"), also known as bad cholesterol, and triglycerides by promoting the

7

dissolution and elimination of fat particles in the blood. Fenofibrate also increases levels of high-density lipoprotein cholesterol ("HDL-C"), also known as good cholesterol.

28.    Fibrates, such as fenofibrate, is one category of cholesterol lowering drugs. Other categories include statins, bile acid sequestrants and niacin. Each category of cholesterol lowering drug reduces cholesterol differently, has different side-effects, has different drug interactions, and is prescribed for different types of patients. A cholesterol lowering drug from one category is not interchangeable with a cholesterol lowering drug from another category.

29.    There are also various fibrate drugs, including TriCor (fenofibrate), Atromid (clofibrate), and Lopid (gemfibrozil). Each fibrate drug is approved by the FDA for different indications, has different side effects, and is prescribed for different types of patients and for people with particular medical histories and ailments. The three types of fibrate drugs are not reasonably interchangeable because of the wide variations in side effects, differences in their approved indications, differences in how they are ingested, and other differences, including those related to their prescription and efficacy profiles.

30.    On January 23, 1990, the United States Patent and Trademark Office ("PTO") issued U.S. Patent 4,895,726 ("'726 patent") to Fournier.

31.    The '726 patent claimed a novel dosage form of fenofibrate containing fenofibrate and a solid surfactant which have been co-micronized. The composition was presented in the form of gelatin capsules.

32.    In 1997, Fournier granted Abbott an exclusive licence to the '726 patent in the United States.

8

33.    On June 20, 1997, Abbott submitted a supplemental NDA for the TriCor 67mg capsule, which was approved by the FDA on February 9, 1998. Abbott also submitted separate NDAs for a 134mg and a 200mg TriCor capsule that were approved on June 30, 1999. The various TriCor dosages came to market shortly after receiving FDA approval and sales rose to $158 million in 2000 and $277 million in 2001.

34.    On December 14, 1999, Novopharm Limited ("Novopharm"), which was subsequently acquired by Teva Pharmaceuticals ("Teva"), filed an ANDA seeking the FDA's approval to market a 67mg generic micronized formulation of fenofibrate prior to the expiration of the '726 patent. Novopharm twice amended its ANDA, on March 31, 2000 and November 27, 2000, in response to Abbott's additional NDAs, seeking the FDA's approval to market a 134mg and a 200mg fenofibrate capsule. Along with its ANDAs, Novopharm certified that its proposed fenofibrate formulations did not infringe the '726 patent.

35.    On May 9, 2000, Impax Laboratories ("Impax") filed an ANDA seeking the FDA's approval to market a generic micronized fenofibrate capsule in 67mg, 134mg, and 200mg dosage forms. Impax certified that its formulations did not infringe the '726 patent.

## THE "SUE-AND-SWITCH" SCHEME

### The First "Sue-and-Switch": Illinois Patent Litigation and Defendants' Switch from Capsule to Tablet

The First "Sue": The Illinois Patent Litigation

36.    On April 7, 2000, August 18, 2000, and March 29, 2001, Defendants filed a series of patent infringement lawsuits in the United States District Court for the Northern District of Illinois against Novopharm (which was acquired by Teva in April 2000), Teva, and Impax. Despite the

9

generic manufacturers certifying that their proposed fenofibrate formulations did not infringe the '726 patent, the Defendants' lawsuits alleged that the generic manufacturers infringed the '726 patent.

37.     Pursuant to the Hatch-Waxman Act, each lawsuit imposed a stay preventing the FDA from granting Teva or Impax final approval to market a generic fenofibrate capsule for up to 30 months.  As a result, the FDA could not approve any of the generic manufacturers' ANDAs, preventing a generic from entering the market with a competing generic to Defendants' TriCor capsules.

38.     On March 19, 2002, the court granted Teva's Motion for Summary Judgment of non-infringement of the '726 patent.  After construing certain claims of the '726 patent, the court held that Teva's proposed generic did not literally infringe the '726 patent and that it did not infringe the '726 patent pursuant to the doctrine of equivalents.

39.     An April 9, 2002, after the judicial opinion holding that Teva's generic did not infringe the '726 patent, the FDA granted Teva final approval to market its 134mg and 200mg fenofibrate capsules.  Teva came to market shortly thereafter.  Because of a change in FDA regulations regarding the Hatch-Waxman Act, Teva received only tentative approval to market the 67mg capsule until the expiration of Abbott's time to appeal the decision or a determination by the Federal Circuit after appeal.

40.     A unanimous panel of the Federal Circuit affirmed the district court's decision on March 20, 2003.  Thereafter, Teva received final approval to market its 67mg fenofibrate capsule. As a result of Abbott's lawsuit and appeal, Teva was unable to lauch its 67mg capsule until late 2003.

41.     On March 26, 2003, the court granted Impax's Motion for Summary Judgment of non-infringement.  The FDA subsequently granted Impax final approval to market its fenofibrate capsule on October 28, 2003.

The First "Switch":  Capsule to Tablet

42.     By filing patent infringement lawsuits, Defendants prevented the FDA from granting final approval to Teva and Impax's generic products for up to 30 months, regardless of whether Defendants' patent infringement suits had any merit.

43.     Defendants used the 30-month stay imposed by the Hatch-Waxman Act to ensure that a generic manufacturer would be unable to come to market when the stay expired.  While the 30-month stay was in place, Defendants destroyed all demand for TriCor capsules and converted demand to TriCor tablets before generic manufacturers could obtain FDA approval of their ANDAs.

44.     By eradicating the TriCor capsules and replacing them with TriCor tablets before the FDA could grant Teva or Impax final approval to market their generic drugs, Defendants ensured that the generic manufacturers would be unable to compete once their generic products were held to be non-infringing.

45.     On November 10, 1999, Abbott filed a NDA for a TriCor tablet in 54mg and 160mg strengths.  The 30-month stay imposed by filing lawsuits against Teva and Impax allowed Abbott to prosecute and obtain approval of Abbott's tablet NDA without fear of generic competition.

46.     Defendants' NDA for TriCor tablets offered no marketable improvements or benefits to consumers over the TriCor capsules because the TriCor tablets contained the same drug as the earlier approved capsules and were bio-equivalent to the capsules.  Defendants even relied upon the

11

same clinical studies to support the NDA for TriCor tablets as they had used to support the NDA for TriCor capsules. The true purpose of the switch was to exclude competition from generic manufacturers and preserve monopoly profits.

47.     Although the tablets did not offer any health-benefits, the new tablets offered Defendants a huge benefit—the ability to prolong its monopoly of the fenofibrate market. Since the TriCor tablets were technically "new", there were no pending ANDAs seeking approval to market a generic tablet. If an ANDA was filed for a generic TriCor tablet, Defendants could secure up to an additional 30 months of monopolistic sales by filing another round of lawsuits.

48.     Switching to TriCor tablets was only the first step Defendants took to unlawfully prolong its monopoly of the fenofibrate market. To ensure the generic manufacturers would be unable to enter the market with their generic drug, Defendants took affirmative steps to destroy the market for fenofibrate capsules by stopping all new sales of TriCor capsules.

49.     After removing the capsules from the market, Defendants' sales force began marketing the tablet formulation and stopped detailing the capsule formulation.

50.     Defendants also removed the TriCor capsule code from the National Drug Data File® ("NDDF"), a widely accepted database of available drugs that includes drug descriptions, pricing information, and indications. In so doing, TriCor's branded drug code reference no longer existed for purposes of generic substitution laws, which prevented a generic fenofibrate capsule from being substituted for the brand-name drug. Defendants removed the capsule code from the NDDF to foreclose generic competition in the fenofibrate product market.

51.     The expense of developing TriCor tablets, switching the manufacturing process to TriCor tablets, training a sales force to market the new tablets, convincing doctors to prescribe the

new tablets, and eliminating the demand for TriCor capsules was extraordinary considering that the end result produced a drug with no significant improvements over the drug already on the market.

52.    The purpose and effect of Defendants' overall scheme was to prevent generic competition that otherwise would have lawfully existed for fenofibrate capsules.  Not only did Defendants delay generic manufacturers from entering the fenofibrate market, but they took affirmative steps to ensue that the generic fenobibrate capsules would be unable to compete.

53.    Defendants' anti-competitive scheme worked.  Defendants' conduct effectively prevented the generic manufacturers from being able to compete in the fenofibrate market as envisioned under the Hatch-Waxman Act.  When Teva launched its fenofibrate capsule, it only captured 5% of the market, whereas a generic usually captures 40% to 80% of the market.  The reason was that Teva's generic capsule could not be substituted as a generic for the bio-equivalent branded product—the Tricor tablet, and Defendants had used its market power to eliminate the demand for the capsule form.

54.    As a direct and proximate result of Defendants' scheme to monopolize, Defendants effectively destroyed generic competition that should have begun in 2001 and improperly maintained at least a 95% share of the market for fenofibrate products that would have eroded substantially in the face of competition.

## The Second "Sue-and-Switch": Delaware Patent Litigation and Defendants' Switch from 54mg/160mg to 48mg/148mg

### The Second "Sue": The Delaware Patent Litigation

55.    Having successfully preserved their monopolistic profits once, Defendants employed the same scheme when generic competitors again attempted to enter the fenofibrate market.

Following Defendants' conversion of the fenofibrate market from capsules to tablets, the generic manufacturers filed ANDAs for 54mg and 160mg tablets.

56.     On June 17, 2002, Teva filed an ANDA with the FDA for its generic fenofibrate 54mg and 160mg tablets.  Teva also certified that its ANDA did not infringe the '726 patent and two additional patents: U.S. Patent No. 6,074,670 (the "'670 Patent") and U.S. Patent No. 6,277,405 (the "'405 Patent").  Teva subsequently amended its ANDA, on July 29, 2003 and again on December 17, 2003, by filing two additional certifications, one for U.S. Patent No. 6,589,522 (the "'522 patent") and one for U.S. Patent 6,652,881 (the "'881 patent"), after Abbott listed each of these patents in the Orange Book as applying to TriCor.

57.     In response to Teva's ANDA for fenofibrate tablets, Defendants filed three separate patent infringement actions against Teva in the United States District Court for the District of Delaware alleging infringement of five patents.

58.     Defendants' first two patent infringement actions once again triggered automatic 30 month stays preventing the FDA from granting final approval to Teva's tablet ANDA for up to 30 months regardless of the merits of Defendants' lawsuits.  Because of modifications to the Hatch-Waxman Act, Defendants were not entitled to a third 30-month stay for filing the third complaint.

59.     In December 2002, Impax filed an ANDA with the FDA for fenofibrate tablets.  Impax also certified that its product did not infringe the '726, the '670, and the '405 patents.

60.     In response to Impax's ANDA for fenofibrate tablets, Defendants filed a patent infringement lawsuit against Impax on January 23, 2003.  The filing of the lawsuit triggered the automatic 30-month stay prohibiting the FDA from giving Impax final approval to market a generic fenofibrate tablet.  The issuance and Orange Book listing of the '552 patent and the '881 patent

14

resulted in Defendants filing additional patent infringement complaints against Impax, the first of which triggered an additional 30-month stay.

61.    On March 5, 2004, the FDA granted tentative approval to Teva and Impax's tablet ANDAs. By granting tentative approval, the FDA indicated that the generic manufacturers' fenofibrate 54mg and 160mg tablets are bioequivalent to TriCor tablets of the same dosage strengths. The tentative approvals by the FDA would have been final approvals but for the successive 30-month stays resulting from Defendants' filing and maintenance of their lawsuits against Teva and Impax.

62.    On May 6, 2005, the U.S. District Court of Delaware granted Teva's motion for summary judgment of non-infringement of the '670 patent, the '552 patent, and the '405 patent. After construing the patent claims, the court concluded, as had the Illinois Court, that Teva's generic product did not infringe the terms of Defendants' patents.

63.    As a result of the summary judgment decision, the FDA granted final approval to Teva's tablet ANDA on May 13, 2005.

64.    Shortly thereafter, and after having obtained the delay they sought, Defendants voluntarily dismissed their patent infringement claims. As they had done during the Illinois patent litigation, Defendants switched the demand for TriCor while the 30-month stay was in place so that, even with the dismissal of the lawsuit and even with Teva and Impax obtaining final approval of its generic produuct, no generic would actually be able to compete.

The Second "Switch": TriCor 54mg/160mg to TriCor 48mg/148mg

65.    On October 29, 2003, while the Delaware patent litigation was ongoing and the 30-month stay prevented the generic manufacturers from entering the market, Defendants filed an NDA for TriCor tablets in 48mg and 154mg strengths. Defendants did not seek FDA approval for this new

formulation until after they knew that Teva had developed 54mg and 160mg generic fenofibrate tablets and was seeking to sell those tablets in the United States.

66.    On November 5, 2004, the FDA approved Abbott's new 48mg and 154mg TriCor tablets. The new tablets are indicated for essentially the same uses as the current 54mg and 160mg tablet dosage forms.

67.    Just as they had done before, Defendants promoted the new dosage forms while eliminating the demand for the old dosages that were soon to face competition. In promotional material for the new dosages, Abbott's website asked:

Q:     Do I have to switch to the new 145-mg or 48-mg tablets?

A:     Yes. The 160-mg and 54-mg tablets will no longer be available.

*See* http://www.tricortablets.com/consumer/patient_ga/index.htm (visited on May 22, 2005. This sentence has since been deleted from Abbott's website).

68.    Defendants' scheme ensured that new prescriptions would cease being written for the 54mg and 160mg fenofibrate tablet formulations. As a result, pharmacists would not be presented with prescriptions that would allow substitution with a generic version of the 54 mg and 160mg tablet formulations, despite the fact that the generic drugs were much cheaper than the brand-name drug.

69.    Had Defendants not instituted their now-voluntarily-dismissed patent infringement lawsuits, the generic manufacturers would have been able to compete and capture a significant portion of the market, even if Defendants did subsequently change their formulation. But, instituting the 30-month stay and then changing the formulation allowed the Defendants the time they needed to block generic competition again and prevent the generic manufacturers from competing.

## COUNT I: VIOLATIONS OF SECTION 2 OF THE SHERMAN ANTITRUST ACT: REQUEST FOR INJUNCTIVE RELIEF

70.     Plaintiff incorporates by reference the preceding allegations.

71.     Defendants knowingly and willfully engaged in a course of conduct designed to unlawfully extend their monopoly power.  This course of conduct included filing and prosecuting a series of patent infringement actions against companies seeking to market fenofibrate products, intentionally shifting demand from dosages and/or formulations that confronted generic competition to dosages and formulations that did not, and eliminating the ability of generic manufacturers to effectively enter the market.  Defendants' scheme was designed to delay the introduction of generic formulations of TriCor into the market and was in violation of Section 2 of the Sherman Act.

72.     Defendants possessed monopoly power in the relevant market.  Defendants intentionally and wrongfully maintained their monopoly power in the relevant market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.  While obtaining and possessing their unlawful monopoly power over the market for Tricor, Defendants set and maintained the price of TriCor at artificially and/or supra-competive levels.

73.     Plaintiff has been injured in its business or property by reason of Defendants' antitrust violations.  Its injury consists of having paid and continuing to pay higher prices for TriCor products than it would have paid in the absence of those violations.  Such injury is of the type antitrust laws were designed to prevent and flows from that which makes Defendants' conduct unlawful.  Plaintiff continues to purchase TriCor and is likely to continue to do so in the future.  Injunctive relief is, therefore, appropriate under 15 U.S.C. § 26.

74.    Plaintiff seeks to enjoin Defendants from engaging in future anticompetitive practices concerning the manufacture, distribution or sale of TriCor. Plaintiff does not seek damages under the federal antitrust laws.

## COUNT II: VIOLATIONS OF STATE ANTITRUST LAWS

75.    Plaintiff incorporates by reference the preceding allegations.

76.    As described above, Defendants knowingly and willfully engaged in a course of conduct designed to unlawfully extend their monopoly power. This course of conduct included filing and prosecuting a series of patent infringement actions against companies seeking to market fenofibrate products, intentionally shifting demand from dosages and/or formulations that confronted generic competition to dosages and formulations that did not, and eliminating the ability of generic manufacturers to effectively enter the market.

77.    Defendants have intentionally and wrongfully maintained their monopoly power in the relevant markets in violation of Arizona Revised Stat. § § 44-1401, et seq., with respect to purchases of TriCor in Arizona by Plaintiff.

78.    Defendants have intentionally and wrongfully maintained their monopoly power in the relevant markets in violation of Cal. Bus. & Prof. code § § 16700, et seq., and Cal. Bus. & Prof. Code § § 17200, et seq., with respect to purchases of TriCor in California by Plaintiff.

79.    Defendants have intentionally and wrongfully maintained their monopoly power in the relevant markets in violation of Nev. Rev. Stat. Ann. § 598A., et seq., with respect to purchases of TriCor in Nevada by Plaintiff.

80.     Plaintiff has been injured in its business or property by reason of Defendants' antitrust violations alleged in this Count. The injury consists of paying higher prices for TriCor prescription drugs than Plaintiff would have paid in the absence of those violations. This injury is of the type the antitrust and consumer protection laws of the above States were designed to prevent and flows from that which makes Defendants' conduct unlawful.

## COUNT III: VIOLATIONS OF STATE CONSUMER FRAUD AND UNJUST ENRICHMENT LAWS

81.     Plaintiff incorporates by reference the preceding allegations.

82.     Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection statutes listed below by improperly filing and prosecuting a series of patent infringement actions against companies seeking to market fenofibrate products, intentionally converting the relevant market from one confronting generic competition to one that was not, and intentionally precluding generic competition by eliminating the ability for generic manufacturers to effectively enter the market. As a direct and proximate result of Defendants' anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Plaintiff was deprived of the opportunity to purchase a generic version of TriCor and was forced to pay higher prices for fenofibrate.

83.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ariz. Rev. Stat. § 44-1522, et. seq.

84.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Cal. Bus. & Prof. Code § 17200, et. seq.

19

85.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Colo. Rev. Stat. § 6-1-105, et. seq.

86.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Nev. Rev. Stat. § 598.0903, et. seq.

87.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices or made false representations in violation of Okla. Stat. tit. 15 § 751, et. seq.

88.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Tex. Bus. & Com. Code § 17.41, et. seq.

89.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Wash. Rev. Code. § 19.86.010, et. seq.

90.    Plaintiff has been injured in its business and property by reason of Defendants' anticompetitive, unfair or deceptive acts alleged above. Plaintiff's injury consists of paying higher prices for TriCor prescription drugs than it would have paid in the absence of these violations. This injury is of the type the state consumer protection statutes were designed to prevent and directly results from Defendants' unlawful conduct.

91.    Defendants have benefited from the monopoly on their sales of TriCor resulting from the unlawful and inequitable acts alleged in this Complaint.

92.    Defendants' financial benefits resulting from their unlawful and inequitable conduct are traceable to overpayments for TriCor by Plaintiff.

93.    Plaintiff has conferred upon Defendants an economic benefit, in the nature of profits resulting from unlawful overcharges and monopoly profits, to the economic detriment of Plaintiff.

94.     The economic benefit of overcharges and unlawful monopoly profits derived by Defendants through charging supra-competitive and artificially inflated prices for TriCor is a direct and proximate result of Defendants' unlawful practices.

95.     The financial benefits derived by Defendants rightfully belong to Plaintiff, as Plaintiff paid anticompetitive and monopolistic prices, inuring to the benefit of Defendants.

96.     It would be inequitable for the Defendants to be permitted to retain any of the overcharges for TriCor derived from Defendants' unfair and unconscionable methods, acts and trade practices alleged in this Complaint.

97.     Defendants should be compelled to disgorge for the benefit of Plaintiff all unlawful or inequitable proceeds received by them.

98.     A constructive trust should be imposed upon all unlawful or inequitable sums received by Defendants.

## PRAYER

WHEREFORE, Plaintiff respectfully requests that this Court enter an Order:

A.      declaring Defendants' conduct to be in violation of § 2 of the Sherman Antitrust Act;

B.      enjoining and restraining Defendants' continuing violations of § 2 of the Sherman Antitrust Act;

C.      declaring Defendants' conduct to be in violation of the antitrust, deceptive practices, and consumer fraud statutes of the states listed above;

D.      granting Plaintiff equitable relief in the nature of disgorgement, restitution, and the creation of a constructive trust to remedy Defendants' unjust enrichment;

E.      granting Plaintiff damages as permitted by law;

F.      granting Plaintiff the cost of prosecuting this action, together with interest and reasonable attorney fees, and costs;

G.      granting other relief as this Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiff demands a trial by jury of all issues so triable.

DATED: August  11, 2005

Respectfully submitted,

MURPHY SPADARO & LANDON

Jonathan L. Parshall (#3247)
1011 Centre Road, Suite 210
Wilmington, Delaware 19805
Telephone: 302-472-8100
Telecopy: 302-472-8135

William Christopher Carmody
John W. Turner
Shawn J. Rabin
SUSMAN GODFREY L.L.P.
901 Main Street, Suite 4100
Dallas, Texas 75202
Telephone: 214-754-1900
Telecopy: 214-754-1933

Mark D. Fischer
Mark S. Sandmann
Jeffrey C. Swann
RAWLINGS & ASSOCIATES
325 West Main, Suite 1700
Louisville, Kentucky 40202
Telephone: 502-587-1279
Telecopy: 502-584-8580

Kendall Zylstra
SCHIFFRIN & BARROWAY, L.L.P.
280 King of Prussia Road
Radnor, PA 19087
Telephone: 610-822-0276
Telecopy: 610-667-7056

ATTORNEYS FOR PLAINTIFFS